AF Approval _Amy_                                                    Chief Approval _OB_

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                      CASE NO. 6:15-cr-11-Orl-28GJK

MARK GARDNER

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by A. Lee Bentley, III, United States Attorney for the Middle District of Florida, and the defendant, MARK GARDNER, and the attorney for the defendant, Brandon Wayne Banks, mutually agree as follows:

### A.    Particularized Terms

   1.    Counts Pleading To

The defendant shall enter a plea of guilty to Counts One and Ten of the Indictment.  Count One charges the defendant with conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 1349.  Count Ten charges the defendant with money laundering, in violation of 18 U.S.C. § 1957.

   2.    Maximum Penalties

Count One carries a maximum sentence of 20 years imprisonment, a fine of $250,000, or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of not more than 3 years, and a special assessment of $100.

Defendant's Initials _MG_

Count Ten carries a maximum penalty of 10 years imprisonment, a fine of $250,000, or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of not more than 3 years, and a special assessment of $100.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offenses, or to the community, as set forth below.

3.     Elements of the Offenses

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty. The elements of Count One are:

First:      Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit mail fraud or wire fraud, as charged in the Information; and

Second:   the Defendant knew the unlawful purpose of the plan and willfully joined in it.

The elements of Count Ten are:

First:      the Defendant knowingly engaged or attempted to engage in a monetary transaction;

Second:   the Defendant knew the transaction involved property or funds that were the proceeds of some criminal activity;

Third:     the property had a value of more than $10,000;

Fourth:    the property was in fact proceeds of wire fraud; and

Defendant's Initials _M G_                    2

Fifth:      the transaction took place in the United States.

4.    Counts Dismissed

At the time of sentencing, the remaining counts against the defendant, Counts Two through Nine, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

5.    No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6.    Mandatory Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. §§ 3663(a) and (b) and 3663A(a) and (b), the defendant agrees to make full restitution to each and every victim (as that term is defined in 18 U.S.C. § 3663A(a)(2)) who lost money as a result of the conspiracy alleged in Count One of the Indictment. The Probation Office shall determine the victims who will be ordered to receive restitution, as well as the amount of restitution for each victim. The defendant agrees and acknowledges that, as of the date of this Plea Agreement, the parties estimate that there are over 250 victims. The defendant agrees and acknowledges that the United States has previously filed a list of potential victims in this case (Doc. 15) and

Defendant's Initials _M.G_          3

that those potential victims may be included in the list of victims to receive
restitution

    7.    <u>Guidelines Sentence</u>

        Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will
recommend to the Court that the defendant be sentenced within the defendant's
applicable guidelines range as determined by the Court pursuant to the United
States Sentencing Guidelines, as adjusted by any departure the United States
has agreed to recommend in this plea agreement.  The parties understand that
such a recommendation is not binding on the Court and that, if it is not accepted
by this Court, neither the United States nor the defendant will be allowed to
withdraw from the plea agreement, and the defendant will not be allowed to
withdraw from the plea of guilty.

    8.    <u>Acceptance of Responsibility - Three Levels</u>

        At the time of sentencing, and in the event that no adverse
information is received suggesting such a recommendation to be unwarranted,
the United States will recommend to the Court that the defendant receive a two-
level downward adjustment for acceptance of responsibility, pursuant to USSG
§3E1.1(a).  The defendant understands that this recommendation or request is
not binding on the Court, and if not accepted by the Court, the defendant will not
be allowed to withdraw from the plea.

        Further, at the time of sentencing, if the defendant's offense level
prior to operation of subsection (a) is level 16 or greater, and if the defendant

Defendant's Initials _M.G_        4

complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9. Cooperation - Substantial Assistance to be Considered

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of

Defendant's Initials _MG_                    5

sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

10.    Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

Defendant's Initials _M G_                          6

11.   <u>Cooperation - Responsibilities of Parties</u>

      a.    The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime.  However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

      b.    It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

      (1)    The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

      (2)    The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to such charges, if any, which have been dismissed,

Defendant's Initials _M G_                 7

the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

Defendant's Initials _M G_                    8

(5)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

12.     Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees.  The assets to be forfeited specifically include, but are not limited to, a money judgment in the amount of at least $1 million, the exact amount to be determined at or before sentencing, which amount will represent the amount of proceeds obtained as a result of the offense charged in Count One.  The defendant also hereby agrees to waive all constitutional, statutory and procedural challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly

Defendant's Initials _M G_                    9

noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government.  Pursuant to the provisions of Rule 32.2(b)(1)(A), the United States and the defendant request that promptly after accepting this Plea Agreement, the Court make a determination that the government has established the amount of the proceeds of the offense to which defendant is pleading guilty is: a money judgment in the amount of at least $1 million.  Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered.  In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees that the United States shall, at its option, be entitled to the forfeiture of any property (substitute assets) of the defendant up to the value of the money judgment.  The Court shall retain jurisdiction to settle any disputes arising from application of this clause.  The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United

Defendant's Initials *N G*                                    10

States before the defendant's sentencing.  The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.  The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG §1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of his cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before the defendant's sentencing.  In addition to providing full and complete information about substitute assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

**B.    Standard Terms and Conditions**

1.    Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied. On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013.  The special assessment is due on the date of sentencing.

The defendant understands that this agreement imposes no limitation as to fine.

2. Supervised Release

The defendant understands that the offenses to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3. Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4. Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the counts to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

Defendant's Initials _MG_                13

5.  <u>Financial Disclosures</u>

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition.  The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party.  The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years.  The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court.  The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

Defendant's Initials _NG_                    14

6.    <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement.  The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office.  The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office.  Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement.  The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.    <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United

Defendant's Initials _M G_                    15

States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    <u>Middle District of Florida Agreement</u>

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.    <u>Filing of Agreement</u>

This agreement shall be presented to the Court, in open court or <u>in camera</u>, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    <u>Voluntariness</u>

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and

defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any).  The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial.  The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.  The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as

Defendant's Initials _M G_                              17

the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11. Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

FACTS

At all times relevant to this case, Gardner Cline, L.L.C. (Gardner Cline) was a limited liability corporation registered with the Florida Department of State. Its principal place of business was located in Seminole County, Florida, in the Middle District of Florida. Defendants Tammie Lynn Cline and MARK GARDNER were the Managing Members of Gardner Cline.

At all times relevant to this case, Vacation Communications Group, LLC (Vacation Communications Group) was a Nevada limited liability company.

Gardner Cline and Vacation Communications Group claimed to be involved in the business of re-selling timeshare properties. Cline was involved in managing and operating a call center located in Seminole County, in the Middle District of Florida.

From an unknown date and continuing until in or about May 2013, Cline, GARDNER, and other conspirators known and unknown engaged in a conspiracy to defraud timeshare owners of money and property by means of

Defendant's Initials _MG_                    18

false and fraudulent pretenses, representations and promises. In particular,

GARDNER and his conspirators engaged in a scheme to deceptively advertise,

market, promote, offer for sale, and sell timeshare resale services through

interstate telephone calls to consumers throughout the United States. The

following is an overview of the conspiracy and scheme of which GARDNER was

a willing participant:

1.　GARDNER and his conspirators made unsolicited telemarketing calls to timeshare owners by using interstate wires from a call center located in Seminole County, in the Middle District of Florida. GARDNER and his conspirators represented in those calls that they were working for Universal Timeshare Sales Associates (UTSA) or M.G.M. Universal Timeshares (MGMUT).

2.　In those interstate telephone calls, GARDNER and his conspirators falsely represented to the timeshare owners that they had buyers who were prepared to purchase the timeshares, that the buyers were willing to pay a specific dollar amount for the timeshare, that the purported buyer had already deposited funds into an escrow account, and, in some instances, that a buyer was present in the showroom at that moment, ready to purchase the timeshare. To further create a false sense of urgency about the sale, GARDNER and his conspirators falsely represented that the sale of the timeshare property would close very soon, sometimes claiming that the sale would close within 90 days.

3.　For any timeshare owner who expressed interest in selling their timeshare property, GARDNER and his conspirators charged a fee for the alleged sale to proceed, which typically ranged from between $1,600 to $2,200. GARDNER and his conspirators falsely represented to timeshare owners that the fee for the alleged sale would pay for various sale-related expenses, such as recording costs and legal fees. Timeshare owners were typically requested to provide their credit card or debit card information for payment of the fee.

4.  For timeshare owners who agreed to pay the fee for the sale of their timeshare property, members of the conspiracy would cause a contract to be sent to the timeshare owners by United States Mail or other means of delivery that included identifying information about the timeshare owner and their timeshare property. Contrary to what had been promised to the timeshare owners (i.e., that there was a buyer lined up who had already agreed to, and was ready to, purchase their timeshare property), the contracts sent to the timeshare owners only provided that UTSA would advertise the timeshare for sale or rent. For some timeshare owners who reviewed the contract and realized that it was only a marketing contract, members of the conspiracy sometimes sent, or caused to be sent, letters to those timeshare owners that falsely represented that there was a buyer for the timeshare property.

5.  After the promised closing date passed with no sale, members of the conspiracy employed a series of tactics to stall timeshare owners from seeking a refund of the fees that they had paid, including by placing consumers on hold indefinitely or by falsely claiming that the purported buyer was having various scheduling or financing difficulties. To further prevent timeshare owners from receiving refunds of the fees that they had paid, members of the conspiracy denied or ignored requests for refunds from the timeshare owners, and they disputed chargebacks with the credit card companies.

The end result was that none of the timeshare owners who paid the fees received what they had been promised by GARDNER and his conspirators. Their timeshares were not sold. In fact, there never were any buyers that were lined up to purchase the timeshares for the amounts that had been promised, and the representations that had been made about the alleged buyers were nothing more than an effort to deceive timeshare owners into paying the fees.

Cline and GARDNER were the managers of the call center in Seminole County, in the Middle District of Florida. Interviews of former

Defendant's Initials _MG_                    20

employees of the Seminole County call center establish that Cline and
GARDNER were involved in making the types of false representations,
summarized above, to get victims to pay the fees.  One of those former
employees has confirmed that Cline and GARDNER were involved in soliciting
and deceiving timeshare owners as summarized above through use of a "three-
step approach."  This former employee described the sales pitch as a "three-step
approach," which entailed three successive telephone calls to the timeshare
owner in order to give the illusion that the purchase offer was legitimate.  If the
timeshare owner was not convinced to agree to the sale, the initial telemarketer
would transfer the call to Cline or GARDNER to help close the sale.  This former
employee realized that the operation was a scam after the former employee saw
Cline and GARDNER, on several occasions, close a sale by personally taking
the telephone and falsely representing to the timeshare owner that they had an
actual paying customer in the showroom at that very moment (which, as
GARDNER knew at the time that he made those representations, was untrue).

        The parties agree and acknowledge that the number of victims who
suffered an actual loss in this case is more than 250 individuals.  Several of
those victims have reported that GARDNER was one of the individuals who
falsely represented to them that a buyer was ready to purchase their timeshare
property.  The following is a summary of four of those victims:

        a.      A victim with the initials of R.G. reported being
                contacted by a sales representative for UTSA and "Mark Gardiner
                on the evening of 4-20-2012 and was told that they could sell my

1B/1B Westgate Timeshare for 18,500.00. I had to give them an upfront fee of $1,850.00 (10%) as a sales fee and so that the paperwork could be processed and sent to Westgate where the balance of my timeshare mortgage would be paid off from the $18,500.00 offered and I would get the difference which would be somewhere around 14,000.00. Unfortunately I took one step too far before catching what was going on (SCAM!!!!!!). Now, I have been in contact with my bank who is about to put in a fraud claim on my account." Contrary to the representation made by GARDNER and his conspirators, R.G.'s timeshare was never sold.

      b.     A victim with the initials of B.W. was contacted on March 29, 2012 by a UTSA representative, "who then passed me over to Tammie Cline, followed by a Mark Gardiner who told me they had a buyer for my timeshare that was for sale. I asked them about their negative online reviews and they assured me that the reviews were bogus and placed online by their competitors. I went along with the sale process and paid them an up-front $1,100. I was told that the sale process could take up to 90 days but wouldn't because they had the buyers there and they were pre-approved." B.W. further stated, "I have asked for proof of the sale numerous times and haven't received anything other than a quickly typed letter stating 'we will like to confirm that we do have a buyer' and 'the sale of your property is guaranteed.'" B.W. reported that the

Defendant's Initials _M G_            22

name of the business that made this contact was UTSA, with an address of 14525 SW Millikan Way Pmb 17820, Beaverton, Oregon.  Contrary to the representations that had been made by GARDNER and others, B.W.'s timeshare was never sold.

     c.    A victim with the initials of P.S. was contacted on or about November 18, 2012 by a telephone sales agent for UTSA, "who said that he had a buyer for my timeshare in Massachusetts but he had to hang up and call me back after he established the credit worthiness of the buyer.  He called back shortly after the first call to me to say that he had a buyer whose credit was ok and that I had to pay $900.00 as the seller's fee to UTSA.  I paid with my American Express card and was told by [sales representative] that I should expect a contract in the mail confirming the transaction.  I then received a call from [sale representative's] supervisor, Mark Gardiner to confirm what had been told to me by [sales representative].  The mailed contract did not confirm a sale of my timeshare, but rather confirmed that I paid $900.00 to list my timeshare for sale by UTSA.  I immediately sent the following email to UTSA: Gentlemen, Your documents have been received which show that I have been duped.  There is no mention of your having established a buyer and furthermore these documents only show that you and UTSA expect to be paid $900.00 simply listing my property for sale.  You totally misrepresented what you were to be

Defendant's Initials _MG_     23

paid for.  There is no buyer for my property as you told me on the telephone.  Please cancel this transaction which is identified on your documents as Account D-834."  The victim continued to state, "I also spoke with Mark Gardiner at UTSA and told him that I was lied to and duped and did not want to pay any money to UTSA.  He countered by saying that UTSA did have a buyer and that the contract was a receipt for the $900.00.  I told him then that I wanted to cancel the transaction.  I learned today that UTSA did charge my American Express card $900.00 which I immediately put in dispute with American Express."  Contrary to the representations made by GARDNER and others, P.S's timeshare was never sold.

d.      A victim with the initials of D.S. was contacted by a sales representative from UTSA: the representative "assured me that he had a buyer in front of him with a firm offer of $23,000.00 and that financing had been approved.  For a sum of $2,200.00 to do title research and legal documentation on my behalf he would be able to close the deal.  After being convinced that he and the company were on the up and up I provided my credit card number."  The victim listed "Mark Gardiner" as of one of the representatives he/she spoke with when dealing with Universal Timeshare S.A. D.S. identified UTSA, with an address of 14525 SW Millikan Way Pmb 17820, Beaverton, Oregon, as being the subject of D.S.'s complaint.

In the course of working as a manager at the call center in Seminole County, in the Middle District of Florida, GARDNER learned that it was false that buyers were lined up, ready to purchase the timeshare properties for the amounts that had been represented. Despite that knowledge, and despite learning that the other representations summarized above (in items 1 through 5 on pages 19 and 20) were false, GARDNER made, and continued to make, those misrepresentations to timeshare owners for the purpose of obtaining money to which he and his conspirators were not entitled.

In an effort to evade detection and to prolong the conspiracy and scheme, another misrepresentation made by GARDNER and his conspirators was the location of the call center and UTSA. As noted above, victims were told in solicitation calls and in documents related to the alleged sales of their timeshare properties that UTSA was located in Beaverton, Oregon. To further conceal the location of their operations, GARDNER directed telemarketers in the Seminole County call center to falsely represent that UTSA and the call center were located in Beaverton, Oregon (which GARDNER knew was not true). In fact, the Beaverton, Oregon location was simply a mail drop.

GARDNER shared in some of the proceeds that were received from his participation in this conspiracy and scheme. A review of records from Gardner Cline SunTrust business checking account #*********5360, from the opening date of April 2, 2010 through August 31, 2013, reveals that Cline and GARDNER (who are the holders and the only authorized signers of those accounts) received over $900,000, consisting of 145 incoming wire transfers

Defendant's Initials _JG_                    25

totaling $966,455.08 that occurred from July 1, 2010 until April 25, 2013.
Transaction Detail Reports from SunTrust further reveal that all 145 of those
transactions, totaling $966,455.08 originated from Banco Multiple Leon, S.A. in
the name of Universal Timeshare, Universal Timeshare S.A., or Universal Call
Center SRL.  The first 122 wires from July 1, 2010 through November 8, 2012
listed an address of Lope De Vega No. 63, Santo Domingo, Dominican Republic.
The remaining 23 wires from November 15, 2012 through April 25, 2013 listed an
address of Lope De Vega, Edif JJ Roca, No. 8 Ave, Dominican Republic.  All 145
wire transactions indicated Account #********5360 as the beneficiary with similar
variations of Gardner Cline, and 141 of those wire transactions further indicated
the telemarketing room address of 4107 Orlando Drive, Sanford, Florida 32773.

One of the wire transfers that was made with criminally derived
proceeds that were obtained as a result of the execution of the wire fraud
scheme occurred on December 20, 2012.  On that date, there was a wire transfer
in and affecting interstate and foreign commerce of $11,617.00, which was made
from a bank account at Banco Multiple Leon, S.A. in the Dominican Republic into
a bank account of Gardner Cline located in the Middle District of Florida at
SunTrust Bank, a federally insured financial institution the accounts and deposits
of which were then insured by the Federal Deposit Insurance Corporation.

The parties agree and acknowledge that the amount of loss in this
case for GARDNER for purpose of the federal sentencing guidelines is between
$1 million and $2.5 million and that there are at least 250 victims who have

Defendant's Initials _MG_                26

suffered an actual loss as a result of the conspiracy and scheme of which GARDNER was a willful participant. This amount was determined by taking the amount of commissions received by Gardner Cline ($966,455.08) and adjusting that amount to reflect the amount of sales on which those commissions were paid. According to a deposition that was taken of Cline and GARDNER by the Federal Trade Commission, Gardner Cline was paid a 60 percent commission for each sale. Applying that percentage, the amount of sales related to the $966,455.08 in commission was approximately $1.6 million.

To further this conspiracy and scheme, GARDNER and his conspirators used interstate and foreign wires, including by making interstate telephone calls from the call center in Seminole County, Florida to timeshare owners located outside of Florida, by receiving interstate telephone calls at the call center in Seminole County, Florida from timeshare owners, by using interstate wires to send emails to timeshare owners, by using interstate wires to receive emails from timeshare owners, by using interstate wires to process credit and debit card payments, and by receiving wire transfers of funds from outside of Florida into an account of Gardner Cline located in the Middle District of Florida. Those interstate wires included the following interstate telephone calls with victims that involved wires that originated or terminated in the Middle District of Florida:

| Date | Description of Wires |
|---|---|
| March 30, 2012 | Telephone call with a victim with the initials of B.W. |

Defendant's Initials _MG_                    27

| April 20, 2012 | Telephone call with a victim with the initials of R.G. |
| July 11, 2012 | Telephone call with a victim with the initials of M.M. |
| November 20, 2012 | Telephone call with a victim with the initials of P.S. |
| January 9, 2013 | Telephone call with a victim with the initials of D.S. |

12.  Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.  Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this _____ day of _____, 2015.

A. LEE BENTLEY, III
United States Attorney


_____
MARK GARDNER
Defendant

_____
Roger B. Handberg
Assistant United States Attorney


_____
Brandon Wayne Banks
Attorney for Defendant

_____
Carlos A. Perez-Irizarry
Assistant United States Attorney
Chief, Orlando Division

Defendant's Initials _____          28